COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
RANDI D. BANDMAN (145212)
9601 Wilshire Blvd., Suite 510
Los Angeles, CA 90210
Telephone: 310/859-3100
310/278-2148 (fax)
randib@csgrr.com
– and –
TRAVIS E. DOWNS III (148274)
JAMES I. JACONETTE (179565)
ELLEN GUSIKOFF STEWART (144892)
BENNY C. GOODMAN III (211302)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
travisd@csgrr.com
jamesj@csgrr.com
elleng@csgrr.com
bennyg@csgrr.com

Attorneys for Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KENNETH TRAVIS, Derivatively on Behalf of WASTE CONNECTIONS, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>RONALD J. MITTELSTAEDT, et al.,<br><br>Defendants,<br><br>– and –<br><br>WASTE CONNECTIONS, INC., a Delaware corporation,<br><br>Nominal Defendant. | No. 2:06-cv-02341-JAM-GGH<br><br>Consolidated Action<br><br>NOTICE OF MOTION AND UNOPPOSED MOTION FOR FINAL APPROVAL OF DERIVATIVE SETTLEMENT AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF<br><br>DATE: July 15, 2009<br>TIME: 9:00 a.m.<br>COURTROOM: The Honorable John A. Mendez |

## TABLE OF CONTENTS


Page

I. Preliminary Statement ... 1

II. THE COURT'S PRELIMINARY APPROVAL OF THE PROPOSED SETTLEMENT ... 3

III. STANDARDS FOR APPROVAL OF DERIVATIVE SETTLEMENT ... 4

IV. THE SETTLEMENT CONFERS SUBSTANTIAL BENEFITS ON WASTE CONNECTIONS AND SHOULD BE APPROVED AS FAIR, REASONABLE, AND ADEQUATE, AND IN THE BEST INTERESTS OF WASTE CONNECTIONS AND ITS SHAREHOLDERS ... 6

- A. The Risks of Establishing Liability and Damages ... 10
- B. The Settlement Was Negotiated by the Parties With a Thorough Understanding of the Strengths and Weaknesses of the Cases ... 14
- C. The Settlement Is Wholly Reasonable in View of the Risks Posed by Continued Litigation ... 15
- D. The Complexity, Expense, and Duration of Continued Litigation ... 16
- E. The Experience and Views of Counsel Favor Approval ... 17

V. THE AGREED-TO ATTORNEYS' FEES AND EXPENSES SHOULD BE APPROVED AS FAIR AND REASONABLE ... 18

- A. Plaintiffs' Counsel Conferred a Substantial Benefit on the Company Justifying the Approval of the Negotiated Fees and Expenses ... 18

VI. CONCLUSION ... 21

# TABLE OF AUTHORITIES


**Page**

**CASES**

*Aronson v. Lewis,*
473 A.2d 805 (Del. 1984) ....................12

*Bacas v. Way*,
No. 4:07-cv-456, 2008 U.S. Dist. LEXIS 23025
(S.D. Tex. Mar. 20, 2008) ....................9, 19

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
603 F.2d 263 (2d Cir. 1979) ....................16

*City of Pontiac Gen. Employees' Ret. Sys. v. Langone, et al.*,
No. 2006-cv-122302, slip op.
(Fulton County, Ga. June 10, 2008) ....................9, 19

*Cohen v. Beneficial Indus. Loan Corp.*,
337 U.S. 541 (1949) ....................6

*Cohn v. Nelson*,
375 F. Supp. 2d 844 (E.D. Mo. 2005) ....................8, 16

*D'Amato v. Deutsche Bank*,
236 F.3d 78 (2d Cir. 2001) ....................18

*Ellis v. Naval Air Rework Facility*,
87 F.R.D. 15 (N.D. Cal. 1980),
*aff'd*, 661 F.2d 939 (9th Cir. 1981) ....................5

*Gay v. Waiters' & Dairy Lunchmen's Union*,
86 F.R.D. 500 (N.D. Cal. 1980) ....................17

*Golden v. Faust*,
766 F.2d 1339 (9th Cir. 1985) ....................4

*Hensley v. Eckerhart*,
461 U.S. 424 (1983) ....................19, 21

*In re AOL Time Warner S'holder Derivative Litig.*,
No. 02 Civ. 6302(SWK), 2006 WL 2572114
(S.D.N.Y. Sept. 6, 2006) ....................18

*In re Apollo Group, Inc. Sec. Litig.*,
No. CV 04-2147-PHX-JAT, 2008 U.S. Dist. LEXIS 61995
(D. Ariz. Aug. 4, 2008) ....................16

**Page**

*In re Apple Computer Sec. Litig.*,
No. C-84-20148(A)-JW, 1991 U.S. Dist. LEXIS 15608
(N.D. Cal. Sept. 6, 1991) ....16

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
55 F.3d 768 (3d Cir. 1995)....4

*In re Heritage Bond Litig.*,
No. 02-ML-1475 DT, 2005 WL 1594403
(C.D. Cal. June 10, 2005) ....5

*In re Lloyd's Am. Trust Fund Litig.*,
No. 96 Civ. 1262 (RWS), 2002 U.S. Dist. LEXIS 22663
(S.D.N.Y. Nov. 26, 2002) ....12

*In re Mego Fin. Corp. Sec. Litig.*,
213 F.3d 454 (9th Cir. 2000) ....14, 15

*In re NVIDIA Corp. Derivative Litig.*,
No. C-06-06110-SBA (JCS), 2009 U.S. Dist. LEXIS 24973
(N.D. Cal. Mar. 18, 2009).... *passim*

*In re Pac. Enters. Sec. Litig.*,
47 F.3d 373 (9th Cir. 1995) ....4, 13

*In re PaineWebber Ltd. P'ships Litig.*,
171 F.R.D. 104 (S.D.N.Y. 1997),
*aff'd*, 117 F.3d 721 (S.D.N.Y. 1998) ....13

*In re Rambus Inc. Derivative Litig.*,
No. C 06-3513 JF (HRL), slip op.
(N.D. Cal. Jan. 20, 2009) ....7, 9, 19

*In re Schering-Plough Corp. S'holders Derivative Litig.*,
No. C-01-1412, 2008 WL 185809
(D.N.J. Jan. 14, 2008) ....20

*In re Semtech Corp. Derivative Litig.*,
No. CV-06-03510-CAS (FMOx),
slip op. (C.D. Cal. Jan. 12, 2009)....19

*In re VeriSign, Inc., Derivative Litig.*,
531 F. Supp. 2d 1173 (N.D. Cal. 2007) ....11

**Page**

*In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006)....12

*In re Zoran Corp. Derivative Litig.*, 511 F. Supp. 2d 986 (N.D. Cal. 2007) ....11

*Ingram v. Coca-Cola Co.*, 200 F.R.D. 685 (N.D. Ga. 2001)....19

*Karstedt v. Isenberg*, No. 4:07-cv-00509, slip op. (S.D. Tex. May 14, 2008) ....19

*Linney v. Cellular Alaska P'ship*, No. C-96-3008 DLJ, 1997 WL 450064 (N.D. Cal. July 18, 1997)....5

*Maher v. Zapata Corp.*, 714 F.2d 436 (5th Cir. 1983) ....13, 20

*Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375 (1970)....7, 20

*MWS Wire Indus., Inc. v. Cal. Fine Wire Co.*, 797 F.2d 799 (9th Cir. 1986) ....4

*Newman v. Stein*, 464 F.2d 689 (2d Cir. 1972)....15

*Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615 (9th Cir. 1982) .... *passim*

*Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370 (9th Cir. 1993) ....5, 6

*Unite Nat'l Ret. Fund v. Watts*, No. 04CV3603DMC, 2005 WL 2877899 (D.N.J. Oct. 28, 2005)....13, 20

*Weiss v. Mercedes-Benz of N. Am., Inc.*, 899 F. Supp. 1297 (D.N.J. 1995) ....16

*Williams v. First Nat'l Bank*, 216 U.S. 582 (1910)....4

**Page**

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
§78j(b) .......... 1
§78n(a) .......... 1
§78t-1 .......... 1

Federal Rules of Civil Procedure
Rule 23.1 .......... 2, 4
Rule 23.1(c) .......... 4

## SECONDARY AUTHORITIES

*Investor Opinion Survey on Corporate Governance*
(McKinsey & Company June 2006)
[www.oecd.org/dataoecd/56/7/1922101.pdf] .......... 9

K.J. Martijn Cremers and Vinay B. Nair,
*Governance Mechanisms and Equity Prices,*
Yale International Center for Finance Working Paper
No. 03-15 (August 2003) .......... 9

Paul A. Gompers, Joy L. Ishii, and Andrew Metrick,
*Corporate Governance and Equity Prices*,
Quarterly Journal of Economics 118 (2003) .......... 9

Ralph C. Ferrara, Kevin T. Abikoff, Laura Leedy Gansler,
*Shareholder Derivative Litigation: Besieging the Board*
§14.06 .......... 20

**TO: ALL PARTIES AND THEIR ATTORNEYS OF RECORD**

PLEASE TAKE NOTICE that on July 15, 2009, at 9:00 a.m., or as soon thereafter as counsel may be heard, plaintiffs Kenneth Travis, Lawrence Pierce, John Banister, and Eugene Booen ("plaintiffs") will move the Court, the Honorable John A. Mendez, United States District Judge presiding, for an order granting final approval of the settlement set forth in the Stipulation of Settlement filed with the Court on March 19, 2009 ("Stipulation"). Plaintiffs' motion is based upon the Stipulation, the accompanying memorandum of points and authorities, the Declaration of James I. Jaconette in Support of Unopposed Motion for Final Approval of Derivative Settlement ("Jaconette Decl."), the Declaration of Beth M. Young in Support of Unopposed Motion for Final Approval of Derivative Settlement ("Young Decl."), and such additional evidence or argument as may be required by the Court.

## I. Preliminary Statement

Plaintiffs respectfully submit this memorandum in support of final approval of the settlement (the "Settlement")[1] of the derivative claims brought on behalf of Waste Connections, Inc. ("Waste Connections" or the "Company") against certain of its current and former officers and directors[2] in connection with an alleged backdating scheme of stock option grants at the Company. The Federal Action alleged claims for violations of §§10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), as well as state law claims for breach of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, constructive fraud and insider selling in connection with the Individual Defendants' alleged backdating of stock option grants to certain Waste Connections' officers and directors. The Settlement resolves the derivative claims pending in this Court as well as

---

[1] Except as otherwise expressly provided, all capitalized terms used in this memorandum shall have the meanings and/or definitions given in the Stipulation, entered into, by and between the parties and submitted to the Court on March 19, 2009 (Docket No. 90).

[2] The "Individual Defendants" are Ronald J. Mittelstaedt, Steven F. Bouck, Darrell W. Chambliss, Michael R. Foos, Eric J. Moser, David M. Hall, Jerri L. Hunt, James M. Little, David G. Eddie, Eric O. Hansen, Kenneth O. Rose, William J. Razzouk, Michael W. Harlan, Eugene V. Dupreau, Robert H. Davis, Robert D. Evans, and Worthing F. Jackman.

in a consolidated derivative action pending in the Superior Court of California, County of Sacramento, styled *In re Waste Connections, Inc. Shareholder Derivative Litigation*, Lead Case No. A504651 ("State Action") (together with the Federal Action, the "Actions").

This Court granted preliminary approval of the proposed Settlement on May 20, 2009. *See* Order Preliminarily Approving Derivative Settlement and Providing for Notice (the "Preliminary Approval Order") (Docket No. 96). In accordance with the Court's Preliminary Approval Order and Rule 23.1, notice of the Settlement has been given to the Company's shareholders, according to the schedule provided in the Preliminary Approval Order. *See* Preliminary Approval Order, ¶¶3-6. The parties are now seeking final approval of the Settlement, as set forth in the Court's Preliminary Approval Order. *See* Preliminary Approval Order, ¶¶2, 9. The parties will respectfully ask the Court to order final approval and enter a judgment at the final approval hearing scheduled at 9:00 a.m., on July 15, 2009. As of the date of this filing, no shareholder has objected to this Settlement.

Indeed, the Settlement is the culmination of over two years of extensive investigation, prosecution, formal and informal discovery, and arm's-length negotiations with the Individual Defendants with the assistance of an experienced mediator, retired Associate Justice of the California Court of Appeal Howard B. Wiener ("Justice Wiener"), which resulted in an outstanding result for the Company. The Settlement obtained represents the resolution of two shareholder derivative actions of substantial complexity.

The Settlement is eminently fair, reasonable, and adequate to Waste Connections and its stockholders as it confers substantial benefits on Waste Connections through the adoption of significant corporate governance reforms. The Unopposed Motion for Preliminary Approval of Derivative Settlement ("Preliminary Approval Motion") filed on March 19, 2009, sets forth the extensive history of the Actions and the significant corporate governance reforms achieved by the Settlement. *See* Preliminary Approval Motion at §§II-III. The reforms garnered by the Settlement not only protect Waste Connections against future instances of wrongdoing as alleged in the Actions, but also significantly strengthen Waste Connection's corporate practices and internal controls generally, providing substantial and lasting value to Waste Connections and its stockholders.

Plaintiffs have also supplemented their demonstration that the corporate governance reforms achieved herein confer a substantial benefit on the Company. Submitted herewith is a declaration by Beth M. Young, an expert in the field of corporate governance of U.S. public companies. Ms. Young reviewed the corporate governance terms of the Settlement, finding the litigation provided meaningful corporate governance reforms, the Settlement's terms contributed to reforming the Company's equity compensation and controls, and the Settlement will ultimately increase the firm's overall value. *See* Young Decl., ¶¶5-21.

The Settlement, negotiated at arm's length and in good faith by the parties, deserves approval by this Court as it is undoubtedly fair, reasonable, and adequate. It constitutes an excellent resolution of the complex shareholder derivative litigation. In recognition of the substantial benefits conferred upon the Company and the efforts expended by Plaintiffs' Counsel in conferring those benefits, Waste Connections has agreed to pay Plaintiffs' Counsel $3 million for attorneys' fees and expenses. This agreed-to amount was negotiated at arm's length after the substantive terms of the Settlement were agreed upon, with the assistance of Justice Wiener.

Accordingly, plaintiffs respectfully submit that the Court should approve the Settlement, including the separately negotiated, agreed-to attorneys' fees and expenses, as fair, reasonable, and adequate, and in the best interests of Waste Connections and its stockholders.

## II. THE COURT'S PRELIMINARY APPROVAL OF THE PROPOSED SETTLEMENT

On May 22, 2009, the Court entered the Preliminary Approval Order. The Preliminary Approval Order provided that the Notice be disseminated to Waste Connections' stockholders through an attachment to a Form 8-K filed with the Securities and Exchange Commission ("SEC") and posting on the Company's website, and that the Summary Notice be published in *Investor's Business Daily*. On May 29, 2009, pursuant to the Preliminary Approval Order, the Company caused the Notice to be filed as an attachment to a Form 8-K filed with the SEC and posted to the Company's website, and the Summary Notice was published in *Investor's Business Daily*. *See*

Declaration of John C. Tang Regarding Notice of Derivative Settlement filed with the Court on June 11, 2009 (Docket No. 97).

## III. STANDARDS FOR APPROVAL OF DERIVATIVE SETTLEMENT

It is axiomatic that the law favors negotiated settlements of claims in litigation. *See, e.g.*, *Williams v. First Nat'l Bank*, 216 U.S. 582, 595 (1910); *MWS Wire Indus., Inc. v. Cal. Fine Wire Co.*, 797 F.2d 799, 802 (9th Cir. 1986); *Golden v. Faust*, 766 F.2d 1339, 1341 (9th Cir. 1985) ("The law encourages settlements to quiet litigation."). Likewise, there is a strong policy favoring compromises that resolve litigation, "particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation." *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995). Settlements are particularly favored in the context of shareholder derivative litigation because they promote judicial economy and serve the public interest. *See, e.g.*, *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 377-78 (9th Cir. 1995).

Federal Rule of Civil Procedure 23.1 governs a district court's analysis of the fairness of a settlement of a shareholder derivative action. While Rule 23.1 intones that a derivative action "may be settled, voluntarily dismissed, or compromised only with the court's approval," Fed. R. Civ. P. 23.1(c), the Ninth Circuit has cautioned that

> the court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned.

*Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982).

Numerous courts have found that where, as here, the parties have thoroughly investigated the factual background of the action, vigorously advanced their respective views of the strengths and weaknesses of the action, negotiated at arm's length and in good faith to arrive at a settlement that confers substantial valuable benefits upon the corporation, there is a presumption that the settlement

is fair, reasonable, and adequate and should thus be approved. *See In re Heritage Bond Litig.*, No. 02-ML-1475 DT, 2005 WL 1594403, at *9 (C.D. Cal. June 10, 2005)[3] ("A presumption of correctness is said to 'attach to a class settlement reached in arm's-length negotiations between experienced capable counsel after meaningful discovery.'"); *Linney v. Cellular Alaska P'ship*, No. C-96-3008 DLJ, 1997 WL 450064, at *5 (N.D. Cal. July 18, 1997) ("The involvement of experienced class action counsel and the fact that the settlement agreement was reached in arm's length negotiations, after relevant discovery had taken place create a presumption that the agreement is fair.").

The Ninth Circuit has also provided factors that may be considered in evaluating the fairness of a class action settlement, which are similarly applicable to shareholder derivative actions:

> The district court's ultimate determination will necessarily involve a balancing of several factors which may include, among others, some or all of the following: the strength of plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed, and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

*Officers for Justice*, 688 F.2d at 625 (citations omitted); *Accord Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1375 (9th Cir. 1993). However, the Ninth Circuit has indicated that a court's inquiry into the fairness of the settlement should be limited:

> [T]he settlement or fairness hearing is not to be turned into a trial or rehearsal for trial on the merits. Neither the trial court nor this court is to reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute, for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements. The proposed settlement is not to be judged against a hypothetical or speculative measure of what ***might*** have been achieved by the negotiators.

*Officers for Justice*, 688 F.2d at 625 (emphasis in original).

Finally, the district court must exercise "sound discretion" in approving a settlement. *Ellis v. Naval Air Rework Facility*, 87 F.R.D. 15, 18 (N.D. Cal. 1980), *aff'd*, 661 F.2d 939 (9th Cir. 1981);

---

[3] All unreported authorities are attached to the Appendix of Unreported Authorities in Support of Final Approval of Derivative Settlement, submitted herewith.

*Torrisi*, 8 F.3d at 1375. Here, plaintiffs respectfully submit that the Court should grant final approval of the Settlement as fair, adequate, and reasonable and in the best interests of Waste Connections and its stockholders.

## IV. THE SETTLEMENT CONFERS SUBSTANTIAL BENEFITS ON WASTE CONNECTIONS AND SHOULD BE APPROVED AS FAIR, REASONABLE, AND ADEQUATE, AND IN THE BEST INTERESTS OF WASTE CONNECTIONS AND ITS SHAREHOLDERS

As a result of protracted and arm's-length settlement negotiations among counsel for the parties, the parties have agreed to a resolution of the Actions that provides substantial benefits to Waste Connections and its stockholders while eliminating the expense, risk, and delay inherent in such complex litigation, including the significant risk of obtaining no benefit.

Courts have repeatedly held that it is in the public interest to have experienced and able counsel enforce the rights of a company through the prosecution of derivative litigation, opining that: "This remedy [derivative actions], born of stockholder helplessness, was long the chief regulator of corporate management and has afforded no small incentive to avoid at least grosser forms of betrayal of stockholders' interests. It is argued, and not without reason, that without it there would be little practical check on such abuses." *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 548 (1949). These Actions are a prime example of the importance for such shareholder litigation to protect the interests of public companies. The Settlement, an outstanding result for Waste Connections, the real party in interest, is the culmination of over two years of investigation, litigation, and extensive arm's-length negotiations among counsel, all of whom are well-experienced in litigating complex shareholder actions such as this one. These cases were researched exhaustively and effectively and efficiently litigated.

The Settlement provides for the following corporate governance reforms to be implemented by Waste Connections: (i) limiting the exercise price of incentive stock options to 100% of fair market value on the grant date of the award; (ii) ensuring that the Company complies with federal disclosure requirements related to stock option grants; (iii) modifying the language of the Company's equity incentive plans to provide for greater clarity and certainty in complying with

granting procedures;(iv) limiting and defining the bodies responsible for granting stock options; (v) providing for definite granting periods for both annual grants and other granting events; (vi) eliminating unanimous written consents and requiring stock options be granted at duly convened meetings; (vii) requiring enhanced procedures for documentation of stock option grants; (viii) imposing disciplinary action for violation of the Company's equity plans; (ix) requiring quarterly Audit Committee oversight of the Company's equity grants; (x) requiring bi-annual Audit Committee assessment of the Company's internal controls relating to stock based compensation; (xi) requiring training in the administration of the Company's stock plans focused on identifying prohibited practices; (xii) requiring the Company to every four years retain an independent consultant to conduct a comparative study of the Company's executive policies, practices, and procedures; and (xiii) providing a budget for director education programs. The Settlement also recognizes that during the pendency of the litigation, the Company appointed a new independent director to the Board and one of the management directors on the Board did not stand for re-election.

Importantly, the Settlement implements a number of valuable corporate governance reforms which confer a substantial benefit on Waste Connections. *See Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 395 (1970) ("a corporation may receive a 'substantial benefit' from a derivative suit . . . regardless of whether the benefit is pecuniary in nature"); *In re NVIDIA Corp. Derivative Litig.*, No. C-06-06110-SBA (JCS), 2009 U.S. Dist. LEXIS 24973, at *5 (N.D. Cal. Mar. 18, 2009) (finding substantial benefit conferred through corporate governance reforms). The corporate governance reforms give Waste Connections' directors greater incentive and ability to represent Waste Connections' public shareholders' interests, many of which have been endorsed by the District Court for the Northern District of California in approving stock option backdating settlements as providing substantial benefits.[4] The corporate governance reforms prevent Waste Connections from backdating executive and non-executive stock options in the future and make Waste Connections'

---

[4] *See, e.g.*, *In re Rambus Inc. Derivative Litig.*, No. C 06-3513 JF (HRL), slip op. (N.D. Cal. Jan. 20, 2009).

directors more effective representatives of the Company's shareholders. These corporate governance reforms will have long-lasting effects on Waste Connections that go beyond the Company's executive compensation practices. *See, e.g.*, *Cohn v. Nelson*, 375 F. Supp. 2d 844, 853 (E.D. Mo. 2005) ("The Settlement's corporate governance reforms specifically designed to minimize the probability of violations of fiduciary duties and federal securities laws in the future. As a result of the implementation to the Settlement's corporate governance changes, [the corporation] is far less likely to become subject to long and costly securities litigation in the future, as well as prosecution or investigation by regulators and prosecutors.").

The Settlement overhauls Waste Connections' past practices for granting stock options (which directly led to the allegations of backdating at Waste Connections) and establishes proper granting procedures and measures designed to ensure that options-related misconduct does not happen in the future. Also, the Settlement resulted in the implementation of improvements to Waste Connections' internal controls, which, in turn, are expected to increase shareholder value. Specifically, the Settlement requires: (a) the adoption of enhanced processes with respect to the grant, exercise, and documentation of future equity grant awards at the Company; (b) the establishment of training programs concerning stock option administration for all directors, officers, and employees of the Company who are part of the stock option granting chain; (c) the adoption of certain enhanced practices relating to the Audit and Compensation Committees; and (d) the attendance by directors at director education programs. *See also* Stipulation, ¶2. Therefore, not only have plaintiffs resolved the stock option backdating issues at Waste Connections, but they have also obtained significant reforms which leave Waste Connections as a better governed company with stronger internal controls and greater independent oversight.

As a result of the comprehensive benefits obtained in the Settlement, Waste Connections and its stockholders are positioned to reap the long-term benefits of strong corporate governance by virtue of these new robust processes. *See NVIDIA*, 2009 U.S. Dist. LEXIS 24973, at *5 (finding substantial benefit conferred through corporate governance reforms including, as here, enhanced director independence, board composition, and additional strengthening of internal controls).

Without a doubt, as recent corporate debacles such as Enron, Tyco and WorldCom demonstrate, "[s]trong corporate governance is fundamental to the economic well-being and success of a corporation. Indeed, 'Courts have recognized that corporate governance reforms such as those achieved here provide valuable benefits to public companies.'" *Id.* at *11-*12 (citation omitted).[5]

Moreover, numerous courts in the context of stock option backdating have found that corporate governance reforms similar to the Settlement's provide a substantial benefit to companies as the terms are designed to not only eliminate the root causes of the conduct of which plaintiffs complained, but also significantly strengthen Waste Connections' internal controls and overall corporate governance. *See Bacas v. Way*, No. 4:07-cv-456, 2008 U.S. Dist. LEXIS 23025, at *6-*7 (S.D. Tex. Mar. 20, 2008) ("*HCC*") (court overruled objection, approved settlement of shareholder derivative stock option backdating action, and found "substantial benefit" to the company in settlement with corporate governance reforms similar to here "that directly address the allegations made by Derivative Plaintiffs"); *Rambus*, slip op. at 3-4 (court approved settlement of shareholder derivative stock option backdating action and found "substantial benefit" to the company where settlement with corporate governance reforms similar to here, "provide[d] long term remedial measures . . . specifically designed to protect the shareholders"); *City of Pontiac Gen. Employees'*

---

[5] Corporate governance improvements are regularly sought by institutional investors in connection with the prosecution and/or resolution of shareholder litigation. The implementation of strong corporate governance practices is perceived by sophisticated institutional investors to substantially enhance the value of corporations which adopt such practices. The end result is that the adoption of such improvements often yields substantially increased market capitalization for these companies implementing them. *See generally Investor Opinion Survey on Corporate Governance* (McKinsey & Company June 2006) [www.oecd.org/dataoecd/56/7/1922101.pdf]. There is also empirical evidence demonstrating that well-governed companies with truly engaged boards of directors tend to outperform those that are not perceived to have these qualities. A 2003 study by Gompers, Ishii and Metrick of over 1500 large companies in the 1990s concluded that stockholders owning shares in the companies with the "strongest" corporate governance mechanisms produced "abnormal" returns 8.5% higher than less well-governed companies. Paul A. Gompers, Joy L. Ishii, and Andrew Metrick, *Corporate Governance and Equity Prices*, Quarterly Journal of Economics 118 (2003). Building on this study, in 2003, Cremers and Nair found that companies with strong corporate governance mechanisms produced annualized returns 10-15% higher than less well-governed companies. K.J. Martijn Cremers and Vinay B. Nair, *Governance Mechanisms and Equity Prices*, Yale International Center for Finance Working Paper No. 03-15; NYU Center for Law and Business Research Paper No. 03-09 (August 2003).

*Ret. Sys. v. Langone, et al.*, No. 2006-cv-122302, slip op. at 2-3 (Fulton County, Ga. June 10, 2008) ("*Home Depot*") (court approved settlement of shareholder derivative stock option backdating action with corporate governance reforms similar to here, and found those reforms "confer substantial benefits to Home Depot and its shareholders").

It should be noted that plaintiffs achieved corporate governance reforms comparable to those agreed to in the shareholder derivative backdating cases citied above, notwithstanding more egregious behavior was alleged by the plaintiffs and even admitted by the company in those cases. Here, Waste Connections continued to defend the propriety of the conduct of its officers and directors throughout the litigation. Nonetheless, plaintiffs and their counsel, through determination and perseverance in this hard-fought litigation, prevailed in accomplishing a resolution to the Actions that confers a substantial benefit upon the Company and its shareholders.

In sum, the Settlement has resulted in improved corporate governance at Waste Connections. *See* Young Decl., ¶¶8-11, 20-21. The corporate governance reforms implemented in the Settlement give more transparency to investors, help avoid future litigation, and will provide ongoing benefits to the Company for years following approval of the Settlement. Accordingly, the Settlement should be granted final approval by the Court.

### A. The Risks of Establishing Liability and Damages

In assessing whether a settlement is fair, adequate, and reasonable, one of the considerations for the Court to balance is the risks of establishing liability. *Officers for Justice*, 688 F.2d at 625.

Complex shareholder litigation is always uncertain, and the Actions are no different. While plaintiffs believe that their claims are meritorious, establishing liability is no certainty. The Settlement confers immediate benefits upon Waste Connections by establishing corporate governance reforms aimed at remedying the root of the problem, Waste Connections' stock option granting practices, as well as broader reforms to strengthen internal controls well into the future. Plaintiffs were required to balance these tangible, certain, and substantial benefits against the real risk that should plaintiffs continue to proceed with the litigation there would be no benefit conferred upon the Company at all, which is a well-recognized rationale for settlement. *See, e.g.*, *Officers for*

*Justice*, 688 F.2d at 625. Plaintiffs' evaluation of the Settlement was further tempered by recognition that any compromise involves concessions on the part of all of the settling parties. Indeed, "the very essence of a settlement is compromise, 'a yielding of absolutes and an abandoning of highest hopes.'" *Id.* at 624 (citations omitted).

While Judge Lew's order granting defendants' motion to dismiss suggested that plaintiffs had adequately plead demand futility in the Federal Action, that is only the first of many obstacles that plaintiffs would have needed to overcome to successfully secure a judgment against the Individual Defendants. Judge Lew's order did not provide any analysis of liability in response to the Individual Defendants' motion to dismiss. Had the Individual Defendants moved to dismiss after plaintiffs cured the technical issues in their pleading, Judge Lew's analysis might very well have led to the dismissal of the Federal Action, perhaps with prejudice. For example, proving liability with respect to some of the claims in the Federal Action would have been difficult based on the application of the respective statutes of limitations and repose to plaintiffs' federal securities claims. *See, e.g, In re Zoran Corp. Derivative Litig.,* 511 F. Supp. 2d 986, 1014-17 (N.D. Cal. 2007) (although plaintiffs adequately alleged demand futility based on allegations of stock option backdating and related misconduct dating back to 1997, plaintiffs' §10b claims dating prior to September 2001 were nevertheless time-barred and plaintiffs' §14a claims dated prior to September 2003 were nevertheless time-barred); *In re VeriSign, Inc., Derivative Litig.*, 531 F. Supp. 2d 1173, 1210-13 (N.D. Cal. 2007) (despite allegations of stock option backdating and related misconduct dating back to 1998, plaintiffs' §10b claims were partially time-barred and could not be based on events occurring prior to March 2001, and plaintiffs' §§14(a) and 20(a) claims were completely time-barred). Although plaintiffs believed that the federal claims were asserted in a timely manner, they also acknowledged the possibility that they might not have been able to establish liability on at least a portion of those claims due to the applicable statutes of limitation and repose.

Last, even assuming plaintiffs had demonstrated that their claims were not time-barred, they still would have had to overcome the significant protections afforded the Waste Connections' Board under the so-called "business judgment rule." The business judgment rule generally affords a strong

presumption that, in making a disinterested business decision, the directors of a Delaware corporation acted on an informed basis, in good faith, and with the honest belief that the action taken was in the best interests of the corporation. *In re Walt Disney Co. Derivative Litig.,* 907 A.2d 693, 746-47 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006); *Aronson v. Lewis,* 473 A.2d 805, 812 (Del. 1984). Although plaintiffs considered their arguments to be strong against the protections afforded by the rule with respect to the acts challenged in the Actions, the prospect that the Individual Defendants could have been shielded by this protective umbrella made establishing liability in the Actions uncertain. Thus, plaintiffs believed that there was a possibility that the Actions might never have progressed beyond the pleading stage, and that the merits of their claims might never have been presented to any court.

Based upon the record and applicable law, it is clear that there were serious risks in overcoming potential defenses and in establishing liability. Even if liability was established, the determination of the amount of recoverable damages would still have posed significant issues. It is not clear what amount of damages plaintiffs could recover on behalf of Waste Connections at trial. Because there was no financial restatement at Waste Connections concerning stock options, submitting at trial the amount of recoverable damages would have required substantial development of evidence combined with expert review and opinions.

Furthermore, the issue of damages would have been subject to further litigation and would have been vigorously disputed and the subject of expert testimony proffered by all parties.[6] The assessment of this crucial element of plaintiffs' claims would have been reduced at trial to a "battle of the experts." It is far from certain how a jury would consider these competing experts' opinions. Indeed, a jury might be swayed by defense experts seeking to establish that damages were caused by factors other than the Individual Defendants' alleged wrongdoing, or, alternatively, trying to

---

[6] *See In re Lloyd's Am. Trust Fund Litig*., No. 96 Civ. 1262 (RWS), 2002 U.S. Dist. LEXIS 22663, at *61 (S.D.N.Y. Nov. 26, 2002) ("[t]he determination of damages . . . is a complicated and uncertain process, typically involving conflicting expert opinions. The reaction of a jury to such complex expert testimony is highly unpredictable").

minimize the amount of the Company's damages. *See, e.g., In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 129 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721 (S.D.N.Y. 1998). While plaintiffs believed that they could have established damages at trial, including the value of backdated options granted to the Company's officers and directors, a jury could conceivably find that there were no damages or a mere fraction of the amount plaintiffs contended.

In affirming the district court's approval of a settlement of a derivative action, the Ninth Circuit noted that "the odds of winning [a] derivative lawsuit [are] extremely small" because "derivative lawsuits are rarely successful." *Pac. Enters.*, 47 F.3d at 378; *NVIDIA*, 2009 U.S. Dist. LEXIS 24973, at *16 ("outcome of [derivative litigation is] by no means a foregone conclusion"). Moreover, even if plaintiffs were successful at trial, the Court likely could not have ordered Waste Connections to adopt the comprehensive corporate governance and internal control reforms plaintiffs achieved in the Settlement, which, as the Fifth Circuit cogently observed, may likely be the most important relief that can be secured in a shareholder derivative action:

> [W]here, as here, the derivative suit is largely an attack on past corporate management practices, as well as on some present officers and directors, the dollar amount of a possible judgment, which is essentially the sole goal in the class action damage suit, is not the sole, and may well not be the most important, matter to be considered, for the effects of the suit on the functioning of the corporation may have a substantially greater economic impact on it, both long- and short-term, than the dollar amount of any likely judgment in its favor in the particular action.

*Maher v. Zapata Corp.,* 714 F.2d 436, 461 (5th Cir. 1983); *see also Unite Nat'l Ret. Fund v. Watts*, No. 04CV3603DMC, 2005 WL 2877899, at *2 (D.N.J. Oct. 28, 2005) (noting that non-monetary benefits can be extremely valuable where "the relief is intended to prevent future harm").

Thus, as opposed to the very real risk of no recovery at all for the Company, the Settlement guarantees an excellent result with the implementation of important and significant corporate governance changes. Accordingly, the Settlement should be approved.

### B. The Settlement Was Negotiated by the Parties With a Thorough Understanding of the Strengths and Weaknesses of the Cases

The stage of the proceedings and the amount of discovery completed is another factor that courts consider in determining the fairness, reasonableness, and adequacy of a settlement. *Officers for Justice*, 688 F.2d at 625.

This Settlement comes at a relatively early stage of the Actions, avoiding the potential for the expense of protracted discovery and trial preparation, the cost of time and attention diverted from the day-to-day business operations of the Company, and of course the burden to the Court of protracted and complex litigation. Ninth Circuit law is quite clear that """formal discovery is not a necessary ticket to the bargaining table" where the parties have sufficient information to make an informed decision about settlement.'" *In re Mego Fin. Corp. Sec. Litig*., 213 F.3d 454, 459 (9th Cir. 2000) (citations omitted). Notwithstanding the relatively early stage in the proceedings, both the knowledge of Plaintiffs' Counsel and the proceedings themselves have reached a stage where an intelligent evaluation of the Actions and the propriety of settlement was made.

As discussed herein, before the commencement of the Actions, Plaintiffs' Counsel conducted extensive investigations of the allegations asserted in the Actions (which investigations continued after the filing of the Actions), and consulted with experts having specialized knowledge in the areas of stock option backdating, accounting, and corporate governance. Jaconette Decl., ¶¶3, 8. In addition, throughout the course of the settlement negotiations, Plaintiffs' Counsel reviewed non-public documents provided to them by the Company. Jaconette Decl., ¶¶3, 21, 25. As a result of these efforts, counsel for plaintiffs, the Company, and the Individual Defendants were able to fully assess the strengths and weaknesses of the Actions and determine that the Settlement embodied in the Stipulation is an excellent resolution of the Actions.

Furthermore, Plaintiffs' Counsel are involved in many option backdating cases in this District and across the country, and are intimately familiar with the legal and factual issues associated with these claims. Jaconette Decl., ¶¶4, 40. Because of their involvement in many cases with similar issues, Plaintiffs' Counsel not only reviewed and analyzed Waste Connections' option granting

documents, but also have reviewed and analyzed the internal option granting documents for many other companies. *Id.* As a result, Plaintiffs' Counsel were in an excellent position to analyze Waste Connections' option granting practices in the context of similar situations with other companies.

Here, Plaintiffs' Counsel's extensive investigation, which included the review of confidential internal Waste Connections' documents, the arm's-length settlement discussions and counsel's past experience in litigating similar actions, provided plaintiffs and their counsel with not only a clear picture of the strengths and weaknesses of the Actions, but also of the sufficiency of the legal and factual defenses that defendants would raise if litigation was to continue. Having enough information to properly evaluate the claims and defenses to be asserted, plaintiffs and their counsel have managed to resolve the Actions on a basis highly favorable to the Company and its shareholders without the substantial expense, risk, delay, and uncertainty of continued litigation. Thus, the parties reached an agreement to settle the Actions at a point when they had an adequate understanding of the legal and factual issues surrounding the cases. *Mego*, 213 F.3d at 459.

After Plaintiffs' Counsel conducted a careful analysis of the law and a thorough examination of the facts relating to the allegations set forth in the Amended Complaint, including information provided by the Company (both in pleadings and in settlement negotiations), they concluded that the resolution of the shareholder derivative claims, and the benefits to be conferred on Waste Connections upon the consummation of the Settlement, would be in the best interests of both the Company and its stockholders.

**C. The Settlement Is Wholly Reasonable in View of the Risks Posed by Continued Litigation**

The determination of a "reasonable" settlement is not susceptible to a mathematical equation yielding a particularized sum. Rather, as one court explained, "there is a range of reasonableness with respect to a settlement." *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972). Given the obstacles and uncertainties inherent here, the Settlement is an excellent result, clearly in the best interests of Waste Connections and its shareholders and is unquestionably superior to another possible outcome – little or no recovery at all.

If not for this Settlement, and should the Actions have progressed beyond pre-trial motions, then the Actions would likely have gone to trial. A trial could occupy attorneys on both sides and the Court for weeks. The expense of such a trial and the use of both judicial resources and the resources of the parties would have been substantial. Furthermore, submitting a matter to a jury is always, at best, an uncertain proposition. *See Weiss v. Mercedes-Benz of N. Am., Inc.*, 899 F. Supp. 1297, 1300-01 (D.N.J. 1995) ("[W]hen parties negotiate a settlement they have far greater control of their destiny than when a matter is submitted to a jury. Moreover, the time and expense that precedes the taking of such a risk can be staggering. This is especially true in complex commercial litigation.").

It is also clear that even a victory at trial is no guarantee that the judgment would ultimately be sustained on appeal or by the trial court. For example, recently in *In re Apollo Group, Inc. Sec. Litig.*, No. CV 04-2147-PHX-JAT, 2008 U.S. Dist. LEXIS 61995 (D. Ariz. Aug. 4, 2008), the court on a motion for judgment as a matter of law, overturned a jury verdict of $277 million in favor of shareholders based on insufficient evidence presented at trial to establish loss causation.[7] Add to these post-trial risks the difficulty and unpredictability of a lengthy and complex trial – where witnesses could suddenly become unavailable or the fact finder could react to the evidence in unforeseen ways – and the benefits of the Settlement become all the more apparent.

**D. The Complexity, Expense, and Duration of Continued Litigation**

Another factor militating in favor of the Settlement is the complexity, expense, and likely duration of the litigation. *Officers for Justice*, 688 F.2d at 625; *Cohn*, 375 F. Supp. 2d at 859. Shareholder derivative actions are notoriously complicated actions that involve convoluted legal and factual issues that can be litigated to a conclusion on the merits only at great expense over an extended period of time. The Actions would not have been an exception to this rule.

---

[7] *See also In re Apple Computer Sec. Litig.*, No. C-84-20148(A)-JW, 1991 U.S. Dist. LEXIS 15608 (N.D. Cal. Sept. 6, 1991) ($100 million jury verdict in favor of plaintiff overturned and j.n.o.v. entered in favor of defendant); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979) (reversing $87 million judgment after trial).

If not for this Settlement, the Actions would have continued to be fiercely contested by the parties. The alleged wrongdoing took place beginning in 1998. Discovering all of the relevant documents and witnesses would have proved difficult. Continued litigation here would also be complex, costly, and of substantial duration. Formal document discovery would need to be commenced and completed, depositions would have to be taken, experts would need to be designated and expert discovery conducted, defendants' expected motions for summary judgment would have to be briefed and argued, and a trial could occupy attorneys on both sides and the Court for weeks. Moreover, any judgment favorable to plaintiffs would likely be the subject of post-trial motions and appeal, which would prolong the cases for years with the ultimate outcome uncertain.

The Settlement provides immediate and substantial benefits to Waste Connections and its stockholders and avoids years of delay, added expense, and uncertainty. A prolonged period of pretrial proceedings and a lengthy and uncertain trial would not serve the interest of the Company and its shareholders in light of the substantial benefits provided by the Settlement. Thus, the prospect of continued protracted expensive and uncertain litigation strongly supports approval of the Settlement.

**E. The Experience and Views of Counsel Favor Approval**

Significant weight should be attributed to the belief of experienced counsel that settlement is in the best interest of those affected by the settlement – here, primarily the real party in interest, Waste Connections. *See Officers for Justice*, 688 F.2d at 625. Waste Connections and plaintiffs and the counsel for each, have independently considered the Settlement and all wholeheartedly agree that it is in the best interests of Waste Connections and its stockholders. *See, e.g.*, *Gay v. Waiters' & Dairy Lunchmen's Union*, 86 F.R.D. 500, 503 n.7 (N.D. Cal. 1980) (noting that the involvement of multiple counsel from different firms suggests a sound result). Here, Plaintiffs' Counsel not only have extensive experience in the area of shareholder representative litigation but have been at the forefront of investigating stock option abuses and are involved in the prosecution of numerous actions on behalf of shareholders alleging stock option abuses in courts nationwide. Jaconette Decl., ¶¶22, 40. As a result of counsel's unparalleled experience in these types of cases, Plaintiffs' Counsel

have a unique insight into the legal and factual issues presented. Counsel used that expertise and experience to effectively and efficiently prosecute the Actions and reach a highly favorable result for Waste Connections and its stockholders.

The assistance of a neutral, well respected mediator, Justice Wiener, also assured a sound result for Waste Connections and its stockholders. *See, e.g., In re AOL Time Warner S'holder Derivative Litig.*, No. 02 Civ. 6302(SWK), 2006 WL 2572114, at *3 (S.D.N.Y. Sept. 6, 2006) ("'a court-appointed mediator's involvement in . . . settlement negotiations helps to ensure that the proceedings were free of collusion and undue pressure'") (quoting *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001)). Howard B. Wiener is a retired Associate Justice of the California Court of Appeal. *See* Declaration of Justice Howard B. Wiener (Ret.) in Support of Unopposed Motion for Preliminary Approval of Derivative Settlement ("Wiener Decl.") (Docket No. 93). He served as an Associate Justice from 1976 until 1994. Since 1994, he has been actively engaged in private dispute resolution, handling more than 2,300 cases as a mediator, arbitrator or private judge. *See* Wiener Decl., ¶2. Justice Wiener, with the full participation of the parties' counsel, scrupulously ensured the integrity of the process by which the parties negotiated the attorneys' fees in these cases and the ultimate settlement. *See id.*, ¶¶2-8. As attested by Justice Wiener, the discourse by the parties at the mediation was focused on the merits, the negotiation was at arm's length, and the result is within the range of comparable cases. *See id.*, ¶¶6, 8.

Accordingly, for all the foregoing reasons the Court should find that the Settlement is fair, reasonable, and adequate to Waste Connections and its stockholders and grant the Settlement final approval.

## V. THE AGREED-TO ATTORNEYS' FEES AND EXPENSES SHOULD BE APPROVED AS FAIR AND REASONABLE

### A. Plaintiffs' Counsel Conferred a Substantial Benefit on the Company Justifying the Approval of the Negotiated Fees and Expenses

Waste Connections has received substantial benefits as a result of Plaintiffs' Counsel's efforts in prosecuting the Actions and negotiating the Settlement and as a result the Company has agreed to pay Plaintiffs' Counsel $3 million in attorneys' fees and expenses to compensate Plaintiffs'

Counsel for their efforts. As discussed herein, the agreed-upon fees and expenses are fair and reasonable in light of the significant benefits achieved by Plaintiffs' Counsel and their significant efforts expended in securing the Settlement, and thus warrant the Court's final approval.

Counsel for Plaintiffs and Waste Connections agreed to such an amount only after the principal terms of the Settlement were agreed upon. Jaconette Decl., ¶26. The attorneys' fees and expenses, which were negotiated by sophisticated counsel familiar with complex shareholder litigation with the involvement of Justice Wiener, reflect an appropriate fee and expense amount for the substantial benefits obtained for the Company in these cases.

Moreover, the parties' agreement on the amount of fees is an appropriate resolution of the issue, and the negotiated fee is consistent with other negotiated fees approved in similar complex stock option derivative cases. *See, e.g.*, *HCC*, 2008 U.S. Dist. LEXIS 23025, at *6 (court approved negotiated fee of $3 million in shareholder derivative option backdating case where relief consisted of corporate governance reforms); *Home Depot*, slip op. at 2-5 (same, $14.5 million fee); *Karstedt v. Isenberg*, No. 4:07-cv-00509, slip op. at 3 (S.D. Tex. May 14, 2008) (same, $2.85 million); *In re Semtech Corp. Derivative Litig.*, No. CV-06-03510-CAS (FMOx), slip op. at 2 (C.D. Cal. Jan. 12, 2009); *Rambus*, slip op. at 3-6 (same, $2 million).

Furthermore, the United States Supreme Court has endorsed this type of consensual resolution of attorneys' fee issues in these kinds of cases as the ideal toward which litigants should strive. In *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983), the Supreme Court stated: "A request for attorney's fees should not result in a second major litigation. Ideally, of course, litigants will settle the amount of a fee." Where there is no evidence of collusion and no detriment to the parties, a court should give "substantial weight to a negotiated fee amount." *Ingram v. Coca-Cola Co.*, 200 F.R.D. 685, 695 (N.D. Ga. 2001). Here, the fee was negotiated with the assistance of Justice Wiener after hard-fought settlement negotiations and after the parties had agreed on the substantive terms of the Settlement. *See* Wiener Decl., ¶¶5-7. Thus, there is no question that the agreed-upon fee was negotiated by the parties at arm's length, carefully and in good faith.

Moreover, under the "substantial benefit" doctrine, counsel who prosecute a shareholder derivative case which confers benefits on the corporation are entitled to an award of attorneys' fees and costs. *Mills*, 396 U.S. 375; *NVIDIA*, 2009 U.S. Dist. LEXIS 24973, at *12 ("Following *Mills*, Ninth Circuit courts have consistently approved attorneys' fees and expenses in derivative stock option backdating actions where plaintiff's efforts resulted in significant monetary recoveries, as well as non-pecuniary benefits in the form of valuable corporate governance.") (citations omitted).

In *Mills*, the United States Supreme Court stated that "an increasing number of lower courts have acknowledged that a corporation may receive a 'substantial benefit' from a [stockholders' action], justifying an award of counsel fees, regardless of whether the benefit is pecuniary in nature." *Id*. at 395. *Accord Unite Nat'l Ret. Fund*, 2005 WL 2877899, at *5 (awarding $9.2 million based on "the great benefit conferred upon [the company] as a result of the new corporate governance principles provided for in the settlement agreement"); *In re Schering-Plough Corp. S'holders Derivative Litig.*, No. C-01-1412, 2008 WL 185809, at *5 (D.N.J. Jan. 14, 2008) (granting attorneys' fees of $9.5 million for the substantial benefits the corporate governance procedures provided to the company). *See also* Ralph C. Ferrara, Kevin T. Abikoff, Laura Leedy Gansler, *Shareholder Derivative Litigation: Besieging the Board* §14.06, at 14-25 to 14-26 (Law Journal Press 2003):

> In class action litigation, attorneys' fees are normally premised on the existence of a "common fund" awarded to the class from which the plaintiffs' attorneys' fees may be deducted. However, in shareholder derivative actions, monetary recovery is not a required predicate to an award of attorneys' fees as long as a "substantial benefit" of some form has been rendered to the corporation as a result of the plaintiff's attorneys' efforts. The substantial benefit may take the form of remedial corporate action to rectify the alleged wrongdoing.

Here, the Settlement provides Waste Connections with valuable corporate governance reforms that as demonstrated herein provide a "substantial benefit" to Waste Connections and its stockholders. *See* §IV, *supra*; *Maher*, 714 F.2d at 461. These corporate governance reforms will not only reduce the chance of the improprieties alleged by plaintiffs from occurring in the future, but also will make directors more effective representatives of shareholders, thus providing additional substantial benefits and value to Waste Connections and its shareholders to last for years to come.

Indeed, courts have consistently recognized that the result achieved is a major factor to be considered in approving a fee award. *See, e.g.*, *Hensley*, 461 U.S. at 436 ("most critical factor is the degree of success obtained"). Thus, in light of the substantial benefits conferred upon the Company by Plaintiffs' Counsel's prosecution and settlement of the Actions, the separately negotiated attorneys' fee and expense award should be approved.

## VI. CONCLUSION

The Settlement achieved is an outstanding result in light of the risks and delays inherent in the litigation and the complexity and expense if the cases proceeded to trial. The Settlement confers substantial benefits on the Company as a direct result of the painstaking effort of Plaintiffs' Counsel. Accordingly, plaintiffs respectfully submit that the Settlement is fair, reasonable, and adequate, and the agreed-to attorneys' fees and expenses are fair and reasonable and both should be approved by the Court.

DATED: June 24, 2009

Respectfully submitted,

COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
RANDI D. BANDMAN
9601 Wilshire Blvd., Suite 510
Los Angeles, CA 90210
Telephone: 310/859-3100
310/278-2148 (fax)

COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
TRAVIS E. DOWNS III
JAMES I. JACONETTE
ELLEN GUSIKOFF STEWART
BENNY C. GOODMAN III

s/ Ellen Gusikoff Stewart
ELLEN GUSIKOFF STEWART

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP

SHAWN A. WILLIAMS
100 Pine Street, Suite 2600
San Francisco, CA 94111
Telephone: 415/288-4545
415/288-4534 (fax)

BARROWAY TOPAZ KESSLER
MELTZER & CHECK, LLP
ALAN R. PLUTZIK
NICHOLE T. BROWNING
2125 Oak Grove Road, Suite 120
Walnut Creek, CA 94598
Telephone: 925/945-0200
925/945-8792 (fax)

BARROWAY TOPAZ KESSLER
MELTZER & CHECK, LLP
ERIC L. ZAGAR
J. DANIEL ALBERT
280 King of Prussia Road
Radnor, PA 19087
Telephone: 610/667-7706
610/667-7056 (fax)

Attorneys for Plaintiffs

Document1

## CERTIFICATE OF SERVICE

I hereby certify that on June 24, 2009, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on June 24, 2009.

s/ Ellen Gusikoff Stewart
ELLEN GUSIKOFF STEWART

COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Telephone: 619/231-1058
619/231-7423 (fax)

E-mail:elleng@csgrr.com

# Mailing Information for a Case 2:06-cv-02341-JAM-GGH

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Randi Dawn Bandman**
  randib@csgrr.com,jamesj@csgrr.com,E_File_SD@csgrr.com,leen@csgrr.com,travisd@csgrr.com,kathyh@csgrr.com,mcalkins@csgrr.com
- **Mary Lynne Calkins**
  mcalkins@csgrr.com
- **Andrew Milton Farthing**
  andrew.farthing@lw.com,maria.solis@lw.com,svdocket@lw.com
- **David M. Friedman**
  DAVID.FRIEDMAN@LW.COM,SARA.HIGGINS@LW.COM,#sfdocket@lw.com
- **Ellen Anne Gusikoff Stewart**
  elleng@csgrr.com
- **James I. Jaconette**
  jamesj@csgrr.com,e_file_sd@csgrr.com
- **Alan R Plutzik**
  aplutzik@btkmc.com
- **John Chung-Chuen Tang**
  john.tang@lw.com,svdocket@lw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

*Travis v. Mittelstaedt, et al. and Waste Connections*
No. 2:06-cv-02341-JAM-GGH

Paul H. Dawes
Latham & Watkins LLP
140 Scott Drive
Menlo Park, CA 94025

Eric L. Zagar
J. Daniel Albert
Barroway Topaz Kessler Meltzer & Check, LLP
280 King of Prussia Road
Radnor, PA 19087